Catherine Kilduff (Bar No. 256331)
David Derrick (CA Bar No. 316745)
CENTER FOR BIOLOGICAL DIVERSITY
2100 Franklin St., Suite 375
Oakland, CA 94612
tel: (510) 844-7100
email: ckilduff@biologicaldiversity.org
email: dderrick@biologicaldiversity.org

*Attorneys for Plaintiffs*

**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY and FRIENDS OF THE EARTH | Case No. |
| *Plaintiffs*, | **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |
| v. | |
| NATIONAL MARINE FISHERIES SERVICE; EUGENIO PIÑEIRO SOLER, in his official capacity as Assistant Administrator for the National Marine Fisheries Service; U.S. COAST GUARD; ADMIRAL KEVIN E. LUNDAY, in his official capacity as Acting Commandant of the U.S. Coast Guard, | |
| *Defendants*. | |

**<u>INTRODUCTION</u>**

1.    California's shipping lanes overlap with important feeding grounds for blue, fin, humpback, and Southern resident killer whales, as well as critically endangered leatherback sea turtles. This has resulted in unsustainable numbers of fatal ship collisions (known as "ship strikes").

2.    The recovery of endangered and threatened whales and sea turtles is literally on a collision course with the increasingly busy shipping traffic off the California coast. Ship strikes

are now the leading cause of death for blue and fin whales off the California coast, and they are the second largest mortality source for humpback whales. Ship strikes cause over 80 deaths of large whales annually between July and November. The population of leatherback sea turtles off the U.S. West Coast has declined to such low levels that more than one human-caused mortality every six years will impede its chance to rebound. This means even occasional ship strikes can have population-wide impacts.

3.      In addition to deaths, shipping causes underwater noise pollution and risks oil spills in identified critical habitat for humpback whales, Southern Resident killer whales, and leatherback sea turtles. Southern Resident killer whales need to echolocate prey; noise pollution interferes with whales' communication and can mask sounds for hunting. Reduced prey availability is one of the primary threats to Southern Resident killer whales.

4.      As the federal agency that regulates and directs vessel traffic off the California coast, the U.S. Coast Guard ("USCG") must ensure through consultation with the National Marine Fisheries Service ("NMFS") that its actions will not jeopardize blue, fin, and humpback whales, leatherback sea turtles, or other protected species. 16 U.S.C. § 1536(a)(2).

5.      USCG approved revised shipping lanes—known as traffic separation schemes—to the San Francisco Bay region and Los Angeles/Long Beach ports that became effective in June 2013. In October 2013, USCG initiated consultation with NMFS because the shipping lanes may affect endangered species and critical habitat. That consultation culminated in NMFS's issuance of a biological opinion in 2017, which concluded that the traffic separation schemes would not jeopardize the continued existence of any endangered species.

6.      In December 2022, a court held NMFS violated the Endangered Species Act ("ESA") by issuing the biological opinion without properly examining and minimizing effects to ESA-listed species and vacated the 2017 biological opinion. The court also held that USCG's reliance on the unlawful biological opinion violated the ESA.

7.      Since then, USCG has studied, recommended, and designated additional routing measures. Yet it has failed to ensure that these actions—and those covered in the biological opinion vacated in 2022—do not jeopardize the continued existence of ESA-listed species, in

violation of section 7(a)(2) of the ESA. 16 U.S.C. § 1536(a)(2). NMFS has unlawfully withheld and unreasonably delayed the completion of consultation on USCG's actions, in violation of the Administrative Procedure Act ("APA"). 5 U.S.C. § 706(1).

8.      Further, USCG's designation and amendment of routing measures constitute major federal actions that require analysis of the impacts to the environment under the National Environmental Policy Act ("NEPA"). 42 U.S.C. §§ 4321–4336f.

9.      Plaintiffs Center for Biological Diversity ("Center") and Friends of the Earth challenge the failure of USCG to comply with the ESA and NEPA in relation to USCG's designation and amendment of vessel routing measures, including traffic separation schemes, that govern approaches to two of the world's busiest port complexes, located in Los Angeles/Long Beach and the San Francisco Bay region. Plaintiffs also challenge NMFS's ongoing failure to complete ESA consultation regarding USCG's agency actions that affect ESA-listed species, in violation of the APA. 5 U.S.C. § 706(1).

10.     Accordingly, Plaintiffs seek (1) declaratory relief that USCG is in violation of the ESA and NEPA, and NMFS is in violation of the APA, and (2) an order compelling the agencies to complete consultation within six months, complete an environmental impact statement ("EIS") within one year, and implement measures intended to reduce ship strikes, including temporary vessel speed reduction and/or routing measures, pending completion of such consultation and EIS.

## JURISDICTION

11.     This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1346, because the case presents a federal question under the laws of the United States, including the ESA, NEPA, and APA.

12.     This Court has jurisdiction over USCG's ESA violations pursuant to the ESA citizen suit provision, 16 U.S.C. § 1540(g). Plaintiffs notified USCG of their intent to sue the agency for these violations on July 30, 2025, more than 60 days prior to the commencement of this case. USCG has not taken sufficient action to remedy its continuing ESA violations by the date of this Complaint's filing.

13.     An actual and present controversy exists between the parties, and the requested relief is proper under the Declaratory Judgment Act, 28 U.S.C. §§ 2201–2202, the APA, 5 U.S.C. §§ 701–706, and the ESA, 16 U.S.C. § 1540(g).

## VENUE

14.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b) and (e), as a substantial part of the events or omission giving rise to the claims has occurred in this district due to decisions of the Defendants. USCG's Eleventh District and Pacific Area headquarters, which coordinate vessel traffic and implement routing measures off the California coast, are in Alameda, within the jurisdiction of this Court. In addition, Plaintiff Friends of the Earth has its principal place of business in this District. No real property is involved in this action.

## INTRADISTRICT ASSIGNMENT

15.     Pursuant to Civil Local Rule 3-2(c)–(d), the appropriate intradistrict assignment of this case is to the San Francisco or Oakland Division.

16.     Pursuant to Civil Local Rule 3-12(b), Plaintiffs will soon file an administrative motion to consider whether this case should be related to Case No. 4:21-cv-00345-KAW in the Oakland Division.

## PARTIES

17.     Plaintiff CENTER FOR BIOLOGICAL DIVERSITY is a non-profit environmental organization dedicated to the protection of endangered species and wild places through science, policy, and environmental law. The Center is based in Tucson, Arizona, with offices throughout the United States, including in Oakland. The Center has more than 93,000 members.

18.     Plaintiff FRIENDS OF THE EARTH is a tax-exempt, 501(c)(3) organization. and a not-for-profit corporation. It has offices in Oakland, California, and Washington, D.C., where it is incorporated. Friends of the Earth is a membership organization consisting of over 159,000 members, including more than 23,000 members who live in California. Additionally, Friends of the Earth has more than 4.7 million activist supporters on its email list throughout the United States. It is also a member of Friends of the Earth International, which is a network of grassroots

groups in 74 countries worldwide. Its mission is to protect our natural environment—including air, water, and land—and to achieve a healthier and more just world, using public education, advocacy, legislative processes, and litigation. Friends of the Earth is concerned about the adverse impacts that vessel traffic has on the environment, including ESA-listed species. Therefore, on behalf of its members and activists, Friends of the Earth's Climate, Energy, and Oceans Program actively engages in advocacy to influence policy and law governing vessel traffic.

19.    Plaintiffs bring this action on behalf of their members who derive ecological, recreational, aesthetic, educational, scientific, professional, and other benefits from the California coastline and adjacent waters of the Pacific Ocean where the shipping lanes, whales, and sea turtles are located.

20.    Plaintiffs' members live near and regularly visit the waters of the Pacific Ocean off the California coast where blue whales, fin whales, and humpback whales often congregate, and where Southern Resident killer whales and leatherback sea turtles can occasionally be observed, to enjoy, study, photograph, recreate, observe, and attempt to observe these animals. Plaintiffs' members regularly visit areas including the Santa Barbara Channel, including but not limited to whale "hot spots" near San Miguel and Santa Rosa islands, as well as areas within and leading to the ports of San Francisco Bay and Los Angeles/Long Beach, among others. Plaintiffs' members have experienced the joy of observing blue, fin, and humpback whales within the Santa Barbara Channel and San Francisco Bay regions and have also experienced the heartbreak of observing dead whales on adjacent coastlines, that were struck and killed by large vessels transiting the area. Many of Plaintiffs' members live in the coastal areas of Los Angeles, the Santa Barbara Channel, and San Francisco Bay, and many of Plaintiffs' members have specific intentions to continue to use and enjoy these areas and adjacent waters of the Pacific Ocean frequently and on an ongoing basis in the future.

21.    One Center member took her young daughter whale watching in Monterey Bay in September 2021 and saw many humpbacks. She regularly looks for whales from shore in Point Reyes National Seashore and has seen migrating grey whales from the Point Reyes lighthouse. In

November 2024, she and her two young children sailed a mile seaward of the Golden Gate Bridge to look for whales but did not see any. She visited Baja California four times in the past four years to observe migrating humpback and grey whales, and she appreciates knowing the same whales she saw in Mexico migrate past the San Francisco Bay area where she lives. In summer 2025, she heard news reports of many dead whales on Bay Area beaches and observed one dead whale near Point Isabel in Richmond. She later learned that the whale died of blunt force trauma, likely from a ship strike. She is now anxious when she sees migrating whales, knowing the threats ship strikes pose and fearing they will be harmed in the near future, lessening her enjoyment of seeing these whales. She and other Center members intend to continue to use and enjoy the habitat of humpback, blue, fin, and killer whales and leatherback sea turtles frequently and on an ongoing basis in the future.

22.    Plaintiffs have a long history of advocacy in relation to ship strike whale mortality off the California coast that is directly relevant to this case. For example, on September 25, 2007, the Center submitted a formal petition pursuant to the APA requesting that NMFS initiate rulemaking to establish a seasonal speed limit of 10 nautical miles per hour (10 knots), on all vessels 65 feet or larger in the Santa Barbara Channel. In its January 8, 2008, denial of the Center's petition, NMFS pledged that "[i]f circumstances similar to those occurring in 2007 recur, or if there are equal or a greater number of blue whale deaths in the future, [NMFS] will reassess the situation in light of available information and make a decision whether a regulatory response is appropriate." In the meantime, when large congregations of blue whales were detected, NMFS would rely on advisories recommending that vessels voluntarily reduce their speed to 10 knots or less. More than 17 years later, ship strikes are now the largest mortality source for numerous species of large whales off the California coast, and NMFS has failed to "reassess the situation" as promised.

23.    Plaintiffs also have litigated similar issues against these Defendants, bringing a case that resulted in a 2022 court order that vacated NMFS's biological opinion for the traffic separation schemes the USCG established under the Ports and Waterways Safety Act ("PWSA").

46 U.S.C. §§ 70001, 70003(a); *Ctr. for Biological Diversity v. NOAA Fisheries*, 644 F. Supp. 3d 574 (N.D. Cal. 2022).

24.    The interests of Plaintiffs' members have been, are being, and will continue to be adversely harmed by USCG's and NMFS's failure to fulfill their procedural and substantive duties under the ESA and APA, and by USCG's failure to fulfill its duty under NEPA. Through NMFS's and USCG's actions and failures to act, ships are being directly routed to areas with high whale densities and valuable sea turtle habitat, inescapably resulting in significant mortality and injury to whales and sea turtles, which in turn significantly and directly harms Plaintiffs' members. These are actual, concrete injuries presently suffered by Plaintiffs' members, and they will continue to occur unless this Court grants relief. The relief sought herein—including an Order compelling NMFS and USCG to complete section 7 consultation for the challenged actions while taking immediate corrective actions, including routing measures and speed restrictions, to reduce ship strike mortality and noise pollution—would redress those harms. Plaintiffs and their members have no other adequate remedy at law.

25.    Defendant NMFS is an agency within the National Oceanic and Atmospheric Administration ("NOAA"). NOAA is an agency of the U.S. Department of Commerce. NMFS is the agency to which the Secretary of Commerce has delegated his authority to conserve endangered and threatened marine and anadromous species under the ESA.

26.    Defendant EUGENIO PIÑEIRO SOLER is sued in his official capacity as Assistant Administrator for NOAA Fisheries (also known as NMFS) and in that capacity has responsibility for its administration and implementation of the ESA and compliance with all other federal laws.

27.    Defendant U.S COAST GUARD is an agency within the U.S. Department of Homeland Security. USCG is responsible for designating, amending, and implementing traffic separation schemes and other routing measures for vessels operating off the California coast, including in the approaches to the Los Angeles-Long Beach and San Francisco Bay Region ports.

1    28.    Defendant ADMIRAL KEVIN E. LUNDAY is sued in his official capacity as the

2    Acting Commandant of USCG. He is USCG's top service official, responsible for all worldwide

3    USCG activities. As Commandant, he is responsible for ensuring USCG, including officials and

4    employees under his supervision, comply with all applicable federal laws, including the ESA.

5    **LEGAL BACKGROUND**

6    **Ports and Waterways Safety Act**

7    29.    Congress passed PWSA in 1967 in response to the grounding of the oil

8    supertanker *Torrey Canyon* in the English Channel. The wreck of the *Torrey Canyon* "had a

9    catastrophic impact on the environment" and "brought to the world's attention, essentially for the

10    first time, the enormous sizes to which tankers had evolved, and the potential of their cargoes for

11    damaging the marine environment." Jeffrey A. Weiss, *Maritime disasters through the ages*, 32 J.

12    Mar. L. & Com. 215, 234 (April 2001).

13    30.    Accordingly, the PWSA emphasizes protection of the marine environment in its

14    first provision. 46 U.S.C. § 70001(a)(1). The PWSA expansively defines "marine environment"

15    to include "the navigable waters of the United States and the land and resources therein and

16    thereunder," fishery resources, and "the recreational, economic, and scenic values of such waters

17    and resources." *Id*. § 70031(1).

18    31.    The PWSA directs USCG to designate vessel routing measures to "provide safe

19    access routes" coming in and out of ports. *Id*. § 70003(a).

20    32.    Before establishing the routing measures, USCG must "undertake a study of the

21    potential traffic density and the need for safe access routes." *Id*. § 70003(c)(1). The PWSA

22    mandates that this "port access route study" ("PARS") consider nine specific factors, including

23    environmental considerations, and requires that USCG "consult with and receive and consider

24    the views of" various stakeholders, including "representatives of . . . environmental groups." *Id*.

25    § 70004.

26    33.    The PWSA also provides USCG with the general authority to "establish[] vessel

27    size, speed, or draft limitations and vessel operating conditions." *Id*. § 70001(a)(4)(C).

28

Complaint                                                                                      8

**Endangered Species Act**

34. The ESA, 16 U.S.C. §§ 1531–1544, is "the most comprehensive legislation for the preservation of endangered species ever enacted by any nation." *Tenn. Valley Auth. v. Hill*, 437 U.S. 153, 180 (1978). Its fundamental purposes are "to provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved, [and] to provide a program for the conservation of such endangered species and threatened species . . . ." 16 U.S.C. § 1531(b).

35. To achieve these objectives, the ESA directs the Secretary of Commerce, through NMFS, to determine which species of plants and animals are "threatened" and "endangered" and place them on the list of protected species. *Id*. § 1533. An "endangered" or "threatened" species is one "in danger of extinction throughout all or a significant portion of its range," or "likely to become an endangered species within the foreseeable future throughout all or a significant portion of its range," respectively. *Id*. § 1532(6), (20).

36. Once a species is listed, the ESA provides a variety of procedural and substantive protections to ensure not only the species' continued survival, but its ultimate recovery, including the designation of critical habitat, the preparation and implementation of recovery plans, the prohibition against the "taking" of listed species, and the requirement for interagency consultation. *Id*. §§ 1533(a)(3), (f), 1536, 1538.

37. Section 7(a)(2) of the ESA requires that "[e]ach Federal agency shall, in consultation with . . . [NMFS], [e]nsure that any action authorized, funded, or carried out by such agency . . . is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of [critical] habitat." *Id*. § 1536(a)(2). This section 7(a)(2) consultation process has been described as the "heart of the ESA." *W. Watersheds Project v. Kraayenbrink*, 632 F.3d 472, 495 (9th Cir. 2011).

38. The schedule that Congress prescribed for completing ESA consultations, *see* 16 U.S.C. § 1536(b)(1)(A), informs the timeline for defining the APA duty to act within a reasonable time, *see* 5 U.S.C. § 555(b). The ESA requires that consultation be completed within

1   90 days of the initiation of consultation unless the action agency and consulting agency agree to

2   another timeline. 16 U.S.C. § 1536(b)(1)(A); *see also* 50 C.F.R. § 402.14(e).

3          39.    NMFS's regulations define an agency "action" to mean "all activities or programs

4   of any kind authorized, funded, or carried out, in whole or in part, by Federal agencies." 50

5   C.F.R. § 402.02 (1986).

6          40.    If a listed species or one that is proposed for listing may be present in a project

7   area, the action agency (here, USCG) must prepare a "biological assessment" to determine

8   whether the listed species may be affected by the proposed action. *Id*. § 402.12 (1986).

9          41.    If the action agency determines that its proposed action may affect any listed

10  species or critical habitat, the agency must normally engage in "formal consultation" with

11  NMFS. *Id*. § 402.14 (1986).

12         42.    Through the formal section 7 consultation process, NMFS prepares a "biological

13  opinion." *Id*.

14         43.    The biological opinion must include a summary of the information upon which

15  the opinion is based, an evaluation of "the current status and environmental baseline of the listed

16  species," the "effects of the action," and the "cumulative effects" of the action. *Id*.

17  § 402.14(g)(2)–(3).

18         44.    The "environmental baseline" consists of "the past and present impacts of all

19  Federal, State, or private actions and other human activities in the action area, the anticipated

20  impacts of all proposed Federal projects in the action area that have already undergone formal or

21  early section 7 consultation, and the impact of State or private actions which are

22  contemporaneous with the consultation in process." *Id*. § 402.02. "Cumulative effects" include

23  "future State or private activities, not involving Federal activities, that are reasonably certain to

24  occur within the action area." *Id*.

25         45.    Accordingly, in issuing a biological opinion, NMFS must consider not just the

26  isolated share of responsibility for impacts to the species traceable to the agency action, but also

27  the aggregate effects of that action when added to all other activities and influences that affect

28  the status of that species, including the environmental baseline.

---

Complaint                                                                                    10

46.    NMFS's consideration of these aggregate impacts informs its required decision "as to whether the action is likely to jeopardize . . . listed species or result in the destruction or adverse modification of critical habitat." *Id.* § 402.14; *accord* 16 U.S.C. § 1536(b)(3)(A). A likelihood of jeopardy is found when "an action [] reasonably would be expected, directly or indirectly, to reduce appreciably the likelihood of both the survival and recovery of a listed species in the wild by reducing the reproduction, numbers, or distribution of that species." 50 C.F.R. § 402.02. Recovery is defined as "improvement in the status of listed species to the point at which listing is no longer appropriate." *Id.*

47.    If NMFS determines that jeopardy is likely, it must provide the action agency with "reasonable and prudent alternatives" to avoid that result. 16 U.S.C. § 1536(b)(3)(A); 50 C.F.R. § 402.14(h)(2).

48.    NMFS must provide an "incidental take statement if a biological opinion concludes an action is not likely to jeopardize the continued existence of a listed species or result in the destruction or adverse modification of critical habitat." This statement must specify the amount or extent of such incidental taking on listed species; any "reasonable and prudent measures" that NMFS considers necessary or appropriate to minimize such impact; and the "terms and conditions" that the action agency must meet in implementing those measures. 16 U.S.C. § 1536(b)(4); 50 C.F.R. § 402.14(i).

49.    The take of a listed species in compliance with the terms of a valid incidental take statement is not prohibited under section 9 of the ESA. 16 U.S.C. § 1536(b)(4), (o)(2).

50.    Agencies must reinitiate consultation on agency actions over which the action agency retains, or is authorized to exercise, discretionary involvement or control, if (1) the amount or extent of taking specified in the incidental take statement is exceeded; (2) new information reveals effects of the action that may affect listed species or critical habitat in a manner or to an extent not previously considered; (3) the identified action is subsequently modified in a manner that causes an effect to the listed species or critical habitat that was not considered in the biological opinion or written concurrence; or (4) a new species is listed or critical habitat designated that may be affected by the identified action. 50 C.F.R. § 402.16(a).

51.     After the initiation or reinitiation of section 7 consultation, the action agency is prohibited from making "any irreversible or irretrievable commitment of resources with respect to the agency action which has the effect of foreclosing the formulation or implementation of any reasonable and prudent alternative measures which would not violate subsection (a)(2)." 16 U.S.C. § 1536(d).

52.     During the consultation process, federal agencies must "use the best scientific and commercial data available." *Id.* § 1536(a)(2); 50 CFR § 402.14(d), (g)(4).

### National Environmental Policy Act

53.     Congress enacted NEPA to ensure that federal, state, and local governments, as well as public and private organizations, "use all practicable means and measures . . . to create and maintain conditions under which man and nature can exist in productive harmony." 42 USC § 4331(a).

54.     NEPA mandates that federal agencies prepare an environmental impact statement for all "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). "The term 'major Federal action' means an action that the agency carrying out such action determines is subject to substantial Federal control and responsibility." *Id.* § 4336e(10)(A).

55.     NEPA requires that agencies take a "hard look" at the impacts of their actions. *Kleppe v. Sierra Club*, 427 U.S. 390, 410 n.21 (1976). The environmental review must include a reasonable range of alternatives. 42 U.S.C. § 4332(2)(C)(iii), (F). The agency must closely examine the EIS "objectively and in good faith, not as an exercise in form over substance, and not as a subterfuge designed to rationalize a decision already made." *Metcalf v. Daley*, 214 F3d 1135, 1142 (9th Cir. 2000).

56.     An agency may prepare an Environmental Assessment to determine whether the environmental impact of a proposed action may be "significant" and thus warrant preparation of an EIS. 42 U.S.C § 4336(b)(2). An agency may only issue a Finding of No Significant Impact for actions with no significant effects. *See id.* If an action may have a significant effect on the

environment, or if there are substantial questions as to whether it may, an EIS must be prepared. 42 U.S.C. § 4332(2)(C).

57.    The Department of Homeland Security ("DHS") directs that "NEPA analysis and appropriate documentation [be] completed before a decision is made and with sufficient time to have a practical influence on the decision making process." DHS Directive 023-01 (Rev. 01); DHS Instruction Manual 023-01-001-01 (Rev. 01).

**Administrative Procedure Act**

58.    Judicial review of a federal agency action is governed by the APA. 5 U.S.C. §§ 701–706. Under the APA, each federal agency must "conclude a matter presented to it" "within a reasonable time." *Id.* § 555(b).

59.    The APA authorizes reviewing courts to "compel agency action unlawfully withheld or unreasonably delayed." *Id.* § 706(1).

**FACTUAL BACKGROUND**

**Whales and Sea Turtles Off the California Coast**

60.    The ocean off California provides valuable habitat for whales and sea turtles migrating hundreds or even thousands of miles to feed. For example, nutrient-rich, cold waters attract humpback whales from Central America and Mexico to eat small fish and krill, Southern resident killer whales from the Pacific Northwest to hunt salmon, and western Pacific leatherback sea turtles from Indonesia searching for jellyfish. These animals, plus endangered blue whales and fin whales, are ESA-listed due to ongoing threats like ship strikes, disturbance and noise pollution, and fishing gear entanglements.

61.    Several large whales, including blues, fins, and humpbacks, were listed as endangered globally under the ESA's predecessor, the Endangered Species Conservation Act of 1969, 35 Fed. Reg. 8,491 (June 2, 1970), and remained on the list of threatened and endangered species after the 1973 passage of the ESA. These large baleen whales have shown signs of recovery since the International Whaling Commission prohibited hunting of them in 1966, but all remain vulnerable today.

1    62.    Humpback whales are the only one of these three large whale species for which

2  NMFS has revised the ESA listing. In 2016, NMFS identified 14 distinct population segments

3  and delisted 9 of those populations. 81 Fed. Reg. 62,260 (Sept. 8, 2016). The two humpback

4  whale populations found off California were not delisted. *Id.* at 62,305–308. NMFS listed the

5  Central America humpback population as endangered and listed the Mexico humpback

6  population as threatened. *Id.* NMFS subsequently designated critical habitat. 86 Fed. Reg. 21,082

7  (Apr. 21, 2021). The boundary of the critical habitat extends into the mouth of the San Francisco

8  Bay to include important humpback whale feeding habitat. *Id.* at 21,111. NMFS identified

9  "prey" as the essential feature of humpback whale critical habitat, and said that inherent in that

10  essential feature is "the whales' ability to move freely to access their prey while on the feeding

11  grounds." *Id.* at 21,116. Thus, a federal action that "has the potential to obstruct the whales'

12  movement and thereby prevent or impede the whales' ability to access prey," is a negative

13  impact on critical habitat. *Id.* Humpback whales regularly travel through and near shipping lanes,

14  and the species' tendency to inhabit coastal waters makes it the second most common species to

15  be injured or killed by collisions with ships.

16    63.    Southern Resident killer whales are a NMFS "species in the spotlight," which

17  means it is one of the ten marine species most at-risk of extinction. NMFS listed Southern

18  Resident killer whales as endangered in 2005, in part due to modifications of their habitat from

19  vessel traffic. 70 Fed. Reg. 69,903, 69,908 (Nov. 18, 2005). In 2006, NMFS designated critical

20  habitat for Southern Resident killer whales in inland waters of Washington State. 71 Fed. Reg.

21  69,054 (Nov. 29, 2006).

22    64.    In 2021, NMFS revised the critical habitat designation to include six additional

23  coastal critical habitat areas along the U.S. West Coast, which stretch from the border with

24  Canada to Point Sur, California. 86 Fed. Reg. 41,668 (Aug. 2, 2021). The revised coastal critical

25  habitat includes the San Francisco Bay shipping lanes, and NMFS wrote that "[v]essel traffic has

26  a Federal nexus through the shipping lanes established by the U.S. Coast Guard (USCG) under

27  the Ports and Waterways Safety Act, and the USCG consults with NMFS to evaluate impacts on

28

Complaint                                                                      14

1    whales and their critical habitat for the regulatory codification of Traffic Separation Schemes

2    (TSS)." *Id.* at 41,676.

3        65.    Another species in the spotlight is the Pacific leatherback sea turtle. Though the

4    leatherback sea turtle has been federally protected since the ESA was enacted and under its

5    predecessor law, it is still one of the marine animals most at risk of extinction in the United

6    States.

7        66.    In 2012, NMFS revised an existing critical habitat designation to add waters off

8    California with sufficient condition, distribution, diversity, abundance and density of prey

9    species (i.e. jellyfish) necessary to support growth, reproduction, and development of

10   leatherbacks, illustrating the importance of these areas for leatherback foraging success and the

11   need to conserve them. 77 Fed. Reg. 4,170 (Jan. 26, 2012). In the final rule's notice, NMFS

12   wrote that "when and if the USCG proposes changes to the existing [traffic separation schemes],

13   we anticipate that NMFS will conduct an ESA section 7 consultation." *Id.* at 4,181.

14           **Vessel Traffic Impacts On ESA-Listed Animals Off the California Coast**

15       67.    Ship strikes, behavioral disturbance due to vessel presence, and underwater noise

16   pollution from vessels threaten the continued recovery of blue, fin, humpback, and Southern

17   Resident killer whales and leatherback sea turtles. Important feeding grounds for these animals

18   occur near ports where USCG has designated routing measures pursuant to the PWSA. Due to

19

20

21

22

23

24

25

26



27   A dead fin whale on the bow of a tanker ship entering Long Beach harbor
     Photo: Alisa Schulman-Janiger
28   Source:  channelislands.noaa.gov/management/resource/images/strike.jpg

Complaint                                                                                    15

this overlap, significant whale mortality from ship strikes has long been documented in the approaches to California's major ports.

68.     Regional response networks have documented collisions between ships, whales, and sea turtles. Records reflect that whales struck by ships suffer violent and painful deaths, with propeller cuts, gashes, fractured or shattered skulls, broken vertebrae, blunt trauma, bruises, and other grievous injuries. Some collisions inflict internal injuries that can only be identified by flensing carcasses to the bone. For some species (e.g., humpbacks), a high proportion of struck whales are calves or juveniles.

69.     Stranding records provide information about the magnitude of the threat of vessel strikes to leatherback sea turtles. From 1989 through 2014 there were 12 reported incidents of vessel-struck leatherback sea turtles in California.

70.     The carcasses of whales and sea turtles killed by collisions often sink before stranding or washing up on a beach. Scientists estimate that the actual number of ship strikes could be ten or twenty times higher than the documented strandings suggest.

71.     In 2019, researchers examining ship-based survey data estimated that 18 blue whales, 22 humpback whales, and 43 fin whales are killed each year by ship strikes off the U.S. West Coast from July to December, with an average of 6 additional humpbacks killed annually between January and April. This analysis confirmed that the shipping lanes for the San Francisco Bay and Los Angeles/Long Beach ports are two of the highest-risk regions for ship collisions with whales.

72.     A 2025 study analyzing data from aerial surveys documented the highest number of blue whales in the Santa Barbara Channel in June, a month not reflected in the estimates of ship strikes above. This indicates that the modelled number of whale deaths are underestimated.

73.     Proven operational measures to reduce the risk of ship strikes, behavioral disruptions, and noise pollution include routing changes that minimize overlap of shipping traffic with high-density whale areas and migration routes, and mandatory, enforced vessel speed restrictions. Scientific literature demonstrates voluntary or incentive-based approaches fail to effectively reduce ship-strike mortality. Studies on both the West and East coasts of the United

States have shown little compliance with voluntary speed reductions. These studies conclude that to conserve and recover endangered whale species, USCG should institute mandatory speed reductions year-round in whale habitat.

74.    A recent scientific study adds strong evidence that additional routing measures and slower ship speeds in areas outside established traffic separation schemes are likely necessary to avoid whale mortality and assist in their recovery. This new science concluded the implementation of a graduated slow-steaming requirement, meaning ships travel at increasingly reduced speeds as they move closer to shore, has the greatest potential to mitigate the widespread threat of vessel strikes.

**USCG's Routing Measures Direct Vessel Traffic Through
Whale Hotspots Without NEPA's Hard Look At Impacts**

75.    Acting pursuant to the PWSA, USCG published a notice of its final Port Access Route Study for the approaches to San Francisco Bay ("San Francisco Bay PARS") in June 2011. 76 Fed. Reg. 35,805 (June 20, 2011). USCG published a notice of the final Port Access Route Study for approaches to Los Angeles-Long Beach and through the Santa Barbara Channel ("Los Angeles/Long Beach PARS") in November 2011. 76 Fed. Reg. 67,395 (Nov. 1, 2011).

76.    More recently, USCG published a notice of the final Port Access Route Study for the Pacific Coast from Washington to California ("PAC PARS") in June 2023. 88 Fed. Reg. 36,607 (June 5, 2023).

77.    The San Francisco Bay PARS, Los Angeles/Long Beach PARS, and the PAC PARS resulted in designation and amendment of routing measures that continue to direct large vessel traffic in areas of important whale and sea turtle habitat.

78.    For example, after considering several options, USCG's final recommendation in the 2011 Los Angeles/Long Beach PARS directed all large vessel traffic through the Santa Barbara Channel. The 2023 PAC PARS amended this routing measure by recommending an alternative southern route around the Channel Islands to/from the Santa Barbara traffic separation scheme.

79.     USCG received comments during the PAC PARS comment periods urging the agency to impose vessel speed restrictions and develop routing measures to reduce vessel strikes of large whale species and other marine wildlife and reduce air pollution. Studies show even slight reductions in speed can have large reductions in greenhouse gas emissions, which pose an additional threat to whales and other protected species. Despite the PWSA's express authority to USCG to regulate ship speeds, 46 U.S.C. § 70001(a)(4)(C), USCG refused to propose speed restrictions to reduce ship strikes and emissions.

80.     Based on information and belief, USCG has issued neither an environmental assessment nor an EIS for the routing measures designated, amended, and implemented in the San Francisco Bay PARS, the Los Angeles/Long Beach PARS, or the PAC PARS.

**USCG and NMFS Have Not Completed ESA Consultation Since Reinitiation in 2020**

81.     On October 24, 2013, USCG initiated ESA section 7 consultation on modifying the traffic separation schemes. The Coast Guard wrote that whales and other listed species in the area "could be affected by ships using the current [shipping lanes] in a number of ways including being struck and injured or killed, exposure to underwater engine and propeller noise, pollution from vessels and disturbance." More specifically, the Coast Guard noted that the current location of the Santa Barbara Channel shipping lane "concentrates ship traffic in some areas where there is a higher density of listed species as opposed to surrounding areas." After more than three years, NMFS issued a biological opinion on February 23, 2017.

82.     On April 29, 2020, USCG requested reinitiation of consultation. On April 30, 2020, NMFS wrote to USCG acknowledging the agency's request.

83.     On January 14, 2021, Plaintiffs filed a lawsuit challenging the 2017 biological opinion because NMFS failed to properly evaluate the impacts of shipping lane designations on endangered whales and sea turtles and because the biological opinion was devoid of an incidental take statement. *Ctr. for Biological Diversity*, 644 F. Supp. 3d at 585–88.

84.     To arrive at their "no jeopardy" conclusion in the 2017 biological opinion, NMFS developed an analytical approach called the "no-lane scenario," which in relative terms showed that shipping lanes reduce the geographic overlap of ships with whales and leatherback sea

turtles. In other words, NMFS compared the effects of the designations of routing measures with a hypothetical scenario of not having shipping lanes.

85.    The court found that NMFS ran afoul of the ESA by comparing the traffic separation schemes to a hypothetical, no-lane scenario, rather than quantifying the actual harm caused by the routing measures. The court observed that "it is undisputed that the impacted, protected species are harmed" by USCG's traffic separation schemes. *Ctr. for Biological Diversity*, 644 F. Supp. 3d at 589. While the harm might be less than the no-lane hypothetical, "that [did] not excuse Defendants from quantifying the incidental take." *Id.* The court vacated the biological opinion after holding that the lack of an incidental take statement rendered it arbitrary, capricious, an abuse of discretion, and not in accordance with law. *Id.*

86.    On July 12, 2021, Defendants filed a motion to stay the proceedings for 17 months to give the agencies time to finish the reinitiated consultation and issue a new biological opinion. The Court denied Defendants' motion to stay.

87.    Based on information and belief, NMFS has not completed ESA consultation since USCG requested reinitiation in 2020.

88.    USCG has continued to act under the PWSA to designate and amend routing measures, including completing the PAC PARS, since requesting reinitiation and without a legally valid incidental take statement in place.

## CLAIMS FOR RELIEF

### Claim One
### USCG Failure to Ensure Against Jeopardy
### (ESA Violation of 16 U.S.C. § 1536(a)(2) and 50 C.F.R. § 402.14(a))

89.    Plaintiffs reallege and incorporate by reference the preceding paragraphs.

90.    USCG has an independent, substantive duty under section 7 of the ESA to ensure that its actions are not likely to jeopardize blue, fin, humpback, or Southern Resident killer whales, leatherback sea turtles, or other ESA-listed species. 16 U.S.C. § 1536(a)(2).

91.    USCG must complete consultation before taking any action that may affect a listed species. *Id.*; 50 C.F.R. § 402.14(a).

92.     USCG's completion of the PAC PARS, which it noticed in the *Federal Register*, constitutes agency action that requires consultation.

93.     By taking these actions without completing consultation, USCG is failing to ensure its actions do not jeopardize ESA-listed whales and sea turtles or destroy or adversely modify their critical habitat, in violation of the ESA. 16 U.S.C. § 1536(a)(2).

94.     A court vacated the 2017 biological opinion and declared USCG's reliance on it unlawful. Therefore, there is no valid biological opinion covering USCG's agency actions related to designating, amending, and implementing routing measures.

95.     USCG must consult on the effects of designation, amendment, and implementation of vessel routing measures on ESA-listed species and their critical habitat.

96.     USCG is therefore in violation of mandatory duties under the ESA and its implementing regulations to conduct the required consultation and ensure its actions under PWSA do not jeopardize the continued existence of ESA-listed species or adversely modify their critical habitat. 16 U.S.C. § 1536(a)(2); 50 C.F.R. § 402.14.

97.     Plaintiffs and their members are injured by USCG's violations of ESA section 7(a)(2) and its failure to complete consultation.

98.     USCG's violations of ESA section 7(a)(2) are subject to judicial review under the ESA citizen suit provision. 16 U.S.C. § 1540(g)(1).

**Claim Two**
**NMFS's Failure to Complete Consultation**
**(APA violation of 5 U.S.C. §§ 555(b), 706(1))**

99.     Plaintiffs reallege and incorporate paragraphs 1–88.

100.     Under the APA, each federal agency must "conclude a matter presented to it" "within a reasonable time." 5 U.S.C. § 555(b). The APA authorizes reviewing courts to "compel agency action unlawfully withheld or unreasonably delayed." *Id*. § 706(1).

101.     The schedule that Congress prescribed for completing ESA consultations, *see* 16 U.S.C. § 1536(b)(1)(A), informs the timeline for defining the APA duty to act within a reasonable time, *see* 5 U.S.C. § 555(b). The ESA requires that consultation be completed within

90 days of the initiation of consultation unless the action agency and consulting agency agree to another timeline. 16 U.S.C. § 1536(b)(1)(A); *see also* 50 C.F.R. § 402.14(e).

102.     USCG reinitiated consultation in 2020, and consultation continued in 2021.

103.     A court vacated NMFS's 2017 biological opinion after it held it was unlawful under ESA section 7(a)(2).

104.     NMFS has failed to complete consultation since USCG reinitiated consultation.

105.     NMFS's failure to complete consultation constitutes agency action unlawfully withheld or unreasonably delayed in violation of the APA. 5 U.S.C. § 706(1).

106.     NMFS's delay in completing the legally required consultation constitutes a failure to conclude a matter presented to it within a reasonable time and an unreasonable delay under the APA. 5 U.S.C. §§ 555(b), 706(1).

107.     NMFS's violation of the APA is subject to judicial review. 5 U.S.C. §§ 701–706.

**Claim Three**
**USCG's Failure to Prepare an Environmental**
**Assessment or Environmental Impact Statement**
**(NEPA and APA Violation of 5 U.S.C. §§ 555(b), 706(1))**

108.     Plaintiffs reallege and incorporate by reference paragraphs 1–88.

109.     NEPA mandates that federal agencies prepare an EIS for all "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). UCSG's completion of the PAC PARS in 2023—and its designation, amendment, and implementation of routing measures under the PWSA—are major federal actions within the meaning of NEPA.

110.     UCSG's designation, amendment, and implementation of routing measures under the PWSA, including the completion of PAC PARS in 2023, are major Federal actions within the meaning of NEPA. 42 U.S.C. §§ 4332(C), 4336e(10). USCG has failed to take the "hard look" at the environmental impacts of its actions that NEPA requires.

111.     USCG's failure to prepare an environmental assessment or EIS constitutes an agency action unlawfully withheld or unreasonably delayed, in violation of the APA. 5 U.S.C. § 706(1). Alternatively, USCG's designating, amending, and implementing vessel routing

measures without first preparing an environmental assessment or EIS is arbitrary, capricious, an abuse of discretion, made without observance of procedure required by law, and not in accordance with NEPA or its implementing regulations, in violation of the APA. *Id*. § 706(2).

112.    USCG violated NEPA because it failed to prepare an environmental assessment or EIS fully analyzing the environmental impacts of designating, amending, and implementing vessel routing measures, including impacts to ESA-listed marine species.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request that this Court:

1. Declare that USCG has unlawfully failed to ensure that its actions do not jeopardize the continued existence of blue, fin, humpback, and Southern resident killer whales and leatherback sea turtles, in violation of Section 7(a)(2) ESA;

2. Declare that NMFS has unlawfully withheld and is unreasonably delaying completion of the biological opinion in violation of the APA;

3. Declare that by not issuing an environmental assessment or EIS, USCG violated NEPA and the APA;

4. Order NMFS to complete a new, legally valid biological opinion within six months;

5. Order USCG to adopt measures that will reduce ship strike risk to ESA-listed species pending the completion of consultation;

6. Order USCG to prepare an environmental assessment or EIS in compliance with NEPA within one year;

7. Grant Plaintiffs their reasonable attorneys' fees and costs associated with this action, as provided by the ESA, 16 U.S.C. § 1540(g)(4), or the Equal Access to Justice Act, 28 U.S.C. § 2412, or other authority; and

8. Grant such other and further relief as the Court may deem just and proper.

1    Respectfully Submitted this 23rd day of October, 2025.

2

3                                           /s/ *Catherine Kilduff*
                                            Catherine Kilduff (Bar No. 256331)
4                                           David Derrick (CA Bar No. 316745)
                                            CENTER FOR BIOLOGICAL DIVERSITY
5                                           2100 Franklin St., Suite 375
                                            Oakland, CA 94612
6                                           tel: (510) 844-7100
                                            email: ckilduff@biologicaldiversity.org
7                                           email: dderrick@biologicaldiversity.org

8

9                                           *Attorneys for Plaintiffs*

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Complaint                                                                    23